UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

SHANUS ROBINSON, )
 )
    Plaintiff, )
 )
v. ) No. 4:04CV730 CEJ
 )
JO ANNE B. BARNHART, )
COMMISSIONER OF SOCIAL SECURITY, )
 )
    Defendant. )

### MEMORANDUM AND ORDER

This matter is before the Court under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the denial of plaintiff's application for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act.

### Procedural History

On March 5, 2002, plaintiff filed applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). (Tr. 41-43, 83-85). The claims were denied on May 29, 2002. (Tr. 27-30, 64-67) On September 9, 2003, plaintiff testified at a hearing before an Administrative Law Judge (ALJ). (Tr. 445-465) In a decision dated January 12, 2004, the ALJ determined that plaintiff was not under a disability as defined by the Social Security Act and was not entitled to a Period of Disability, Disability Insurance Benefits, or Supplemental Security Income Benefits. (Tr. 14-21) The Appeals Council subsequently denied plaintiff's request for review. (Tr. 4 -6) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

### Evidence Before the ALJ

At the hearing before the ALJ, plaintiff was represented by counsel. Plaintiff testified that she

was born on February 25, 1979. She resided in a house with her mother. Plaintiff completed the 12th grade and graduated from high school in June of 1998. Plaintiff testified that, although she did not receive special education in high school, she did take special education classes for speech and "adapted PE" from first grade through junior high school. Plaintiff did attend college, receiving a certificate in computer applications. However, she could not find any jobs in that field despite looking for a job recently. Plaintiff testified that she previously worked at Wal-Mart as a stock clerk. She stopped working because she was unable to climb ladders, kneel or squat. (Tr. 448-450, 464)

Plaintiff stated that she had a driver's license. However, she had problems with the written portion of the driver's license test, which she took three times. Plaintiff took the driving portion of the test five times before passing. Plaintiff testified that she drove without any problems. She had a left foot accelerator because it would be unsafe to drive with her right leg prosthesis. Plaintiff stated that she could not take public transportation because going up and down the steps was painful because of arthritis in her left knee. (Tr. 450-452)

With regard to past jobs, plaintiff testified that she last worked at St. Joseph's Hospital in Kirkwood, Missouri, in September of 2002. Plaintiff only worked there for two weeks, quitting because the job was too difficult and too hard on her knee. Her duties included getting on her hands and knees to scrub, which bothered her left knee. In addition, her right leg prosthesis had a tendency to rub. Plaintiff stated that it was difficult to stand for a long period of time because her knees gave out. However, when she sat, her knees became stiff. (Tr. 452-453)

Plaintiff further testified that a doctor diagnosed deteriorating arthritis in her left knee. Her right leg was amputated in November or 1997 after being diagnosed with neuralfibromatosis and arthrosis of the tibia and fibula. Plaintiff was able to walk with the prosthesis, but she could not walk

2

long distances. She could walk around her block, which was very hilly. However, she did not do so very often because it caused her left knee to swell. Plaintiff also suffered from tumors called neuralfibromas as a result of the nueralfibromatosis. She testified that the tumors itched and that she used hydroxine to relieve the itching. The neuralfibromas were located on her face, neck, arms, legs, feet, and hands. Plaintiff saw a neurologist, Dr. Lee, once a year for her neuralfibromatosis, which was a genetic disorder that caused tumors to grow on nerve endings. Plaintiff stated that some tumors grew on her stump which sometimes rubbed and caused blisters. She had special band-aids for the blisters. (Tr. 453-456)

Plaintiff also saw an eye doctor for astigmatism and poor eyesight. He also checked to make sure she did not have tumors behind her eyes. In addition, plaintiff testified that she saw a psychiatrist, Dr. Araim. Prior to that, plaintiff was treated by Drs. Baron and Vanedaway. Plaintiff first sought treatment in October of 2002 after a suicide attempt. Plaintiff was hospitalized for two days, then she spent a week at the Metropolitan Psychiatric Center. Plaintiff testified that her diagnosis was severe depression. She took Beaproprion for depression, BuSpar for anxiety, and Trazodone for sleeping. Plaintiff believe that the medications helped. However, she still had days when she did not want to get out of bed. In addition, she experienced crying spells once a month. Plaintiff stated that her inability to find a job and help her mother contributed to her crying spells. Plaintiff also testified that she suffered from low self-esteem because she felt society did not accept her due to her neuralfibromatosis. (Tr. 457-460)

With regard to activities, plaintiff stated that she was no longer able to dance. She did help with the housework by vacuuming, dusting, cleaning the kitchen, and occasionally cooking. When plaintiff's knee bothered her, it was difficult for her to push the vacuum. Plaintiff further testified that

3

she experienced feelings of regret about her life because she was unable to help her mother pay the bills. Plaintiff stated that she was not capable of performing the jobs she applied for on a full-time basis. Plaintiff last applied for work at Kohl's, a department store, but she stated that it would be hard for her to be on her feet all day. Additionally, she was unable to kneel and squat because of her knee. Plaintiff opined that she could stand for an hour at a time during an eight-hour workday. Further, her skin was sensitive due to her neuralfibromas. (Tr. 461-463)

## **Medical Evidence**

The medical records indicate that plaintiff was diagnosed with neurofibromatosis as a child. She saw Dr. James R. Rohrbaugh on a yearly basis. (Tr. 216-260) Doctors at the Shriner's Hospitals also diagnosed and treated plaintiff for pseudoarthritis of the right tibia. (Tr. 282-311) On November 3, 1997, plaintiff underwent an amputation of her right leg below the knee. (Tr. 278-279) Plaintiff subsequently received a prosthesis and attended physical therapy for prosthetic training. (Tr. 271-273) On April 13, 2000, plaintiff complained of left knee pain. Dr. Steven Klepps noted lateral patella grind with genu valgum deformity. However, she also had full range of motion with no evidence of effusion, meniscal pain, or laxity. He recommended that plaintiff undergo physical therapy, take anti-inflammatory medication, and utilize a left knee sleeve. (Tr. 268) Plaintiff attended physical therapy sessions. However, on October 18, 2000, Dr. David Hockman assessed recurrence of patellofemoral pain after stopping her exercises. He made some adjustments to her knee brace to prevent her from hyperextending the knee. (Tr. 263-267) X-rays of plaintiff's left knee demonstrated normal alignment with minimal cystic changes and genuvalgus. (Tr. 262)

Dr. Raymond Leung examined plaintiff on April 26, 2002. Plaintiff reported left knee pain on and off. The pain could escalate to an intensity of 9/10 and occasionally woke her up at night.

4

She reported that Aleve helped the pain. Dr. Leung noted that plaintiff was in no apparent distress. Physical examination was relatively normal. However, plaintiff could not heel or toe walk. She was able to squat two-thirds of the way down. Plaintiff walked with a mild limp and had atrophy and decreased flexion in the right leg. Plaintiff had no problems getting on and off the examination table. Dr. Leung assessed neurofibromatosis; right below the knee amputation; and left knee arthritis with full range of motion in the left knee. (Tr. 312-315)

On May 28, 2002, a state agency physician completed a Physical Residual Functional Capacity Assessment form. The physician determined that plaintiff could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds. She could stand and/or walk for at least 2 hours in an 8-hour workday and sit for a total of 6 hours in an 8-hour workday. Plaintiff was limited in her lower extremities with regard to pushing and/or pulling due to her below the knee amputated right leg. The physician opined that plaintiff should avoid climbing ladders and scaffolding as a result of her prosthesis. Plaintiff had no manipulative, visual, or communicative limitations. She needed to avoid concentrated exposure to hazards such as machinery or heights. (Tr. 168-175)

On October 24, 2002, plaintiff was admitted to the Metropolitan St. Louis Psychiatric Center after taking an overdose of Aleve. Plaintiff was diagnosed with major depression without psychosis, single episode and a GAF of 30 on admission. On discharge, Dr. James Rutherford prescribed Paxil and assessed a GAF of 65.[1] He recommended that plaintiff see Dr. Vaneerdewegh for follow-up. Plaintiff's severity of illness was normal, not at all, and her GAF was very much approved. (Tr. 357-

---

[1] A GAF score of 61 to 70 indicates "some mild symptoms . . . OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000).

360, 408)

Plaintiff received treatment through BJC Behavioral Health from November 4, 2002 through May, 2003. (Tr. 338-354) Plaintiff's initial assessments were Major Depression, Recurrent; Centralized Anxiety Disorder; Dysthymic Disorder; and a GAF of 50.[2] (Tr. 354) These diagnoses remained the same throughout her treatment. (Tr. 338) However, plaintiff attended Adult Vocational Services and applied for many jobs during this time period. Further, by May of 2003, plaintiff was doing very well. Plaintiff subsequently transferred to SLU Medical Care after Dr. Vaneerdewegh left BJC. (Tr. 338, 348)

Plaintiff was treated at St. John's Mercy Medical Center for various ailments between February 2003 and May 2003. An MRI of plaintiff's cervical spine performed on April 28, 2003 revealed neurofibromas. A brain MRI performed on that same date was unremarkable. (Tr. 320-335)

Plaintiff initially saw Dr. Baram and Dr. Klein at the St. Louis University Wohl Clinic for a psychiatric intake evaluation on May 13, 2003. Drs. Baram and Klein assessed Major Depressive Disorder, recurrent, moderate, without psychotic features and a GAF of 65 to 70. The doctors noted that plaintiff was stable on a regimen of Wellbutrin, BuSpar, and Trazadone and had only mild to moderate depressive symptoms. They continued plaintiff on her medications and recommended that she return for treatment every four weeks. (Tr. 424-427) Plaintiff saw Dr. Baram on June 12, 2003. He noted that she was stable on BuSpar, Wellbutrin, and Trazadone. (Tr. 422)

On August 27, 2003, plaintiff saw Dr. Sy Araim. Plaintiff reported doing well with stable

---

[2] A GAF of 50 indicates "Serious symptoms . . . OR any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000).

6

mood and no crying spells. She kept herself busy working on her computer. Dr. Araim assessed Major Depressive Disorder, recurrent, without psychotic features. He continued plaintiff on her current medications and recommended that she return in 8 weeks. An attending psychiatrist opined that plaintiff's depression was a single episode and in remission. On September 2, 2003 Dr. Araim completed a Mental Medical Source Statement. He noted marked limitations in Plaintiff's ability to cope with normal work stress; function independently; and behave in an emotionally stable manner. Plaintiff had moderate limitations in maintaining reliability. Dr. Araim opined that Plaintiff had mild to moderate limitations in all areas of social functioning and concentration, persistence, or pace. Dr. Araim believed that Plaintiff's limitations were expected to last 12 continuous months and that those limitations existed for about one year. Dr. Araim noted, however, that while plaintiff had Major Depressive Disorder, recurrent, and a GAF of 50, he had seen plaintiff on only one occasion. (Tr. 438-441)

## **The ALJ's Determination**

In his Decision, the ALJ determined that plaintiff met the disability insured status requirements of the Act on June 30, 2001, her alleged onset date, and continued to meet them through December 2004. Further, the ALJ noted that plaintiff had not engaged in substantial gainful activity since September 2002. The medical evidence established that plaintiff had right below knee amputation, neurofibromatosis, left knee strain, and major depression but that she did not have an impairment or combination of impairments that met or equaled the listings. Further the ALJ found that plaintiff's psychiatric condition was not severe. (Tr. 20)

The ALJ further found that plaintiff's allegations of disabling symptoms which precuded all substantial gainful activity were neither consistent with the evidence nor credible. He determined that

7

plaintiff had the residual functional capacity (RFC) to perform work except work that required lifting over ten pounds or standing and walking for more than two hours during an eight-hour workday. The ALJ found no exertional or nonexertional limitations. While plaintiff was unable to perform any of her past relevant work, she had the RFC to perform the full range of sedentary work. The ALJ noted that plaintiff's failure to comply with medical directives was inconsistent with her allegations of disability. In light of plaintiff's young age, education, RFC, and work experience, the ALJ concluded that she was not disabled. (Tr. 20)

The ALJ specifically assessed plaintiff's testimony and medical records. He noted no findings of severe or disabling neurofibromatosis or left knee condition. Further, he assessed plaintiff's mental health history, finding that the treatment notes were inconsistent with a severe or disabling psychiatric condition. The ALJ noted Dr. Araim's opinion that plaintiff had marked impairments in handling work stress. The ALJ found that this assessment was inconsistent with Dr. Araim's treatment notes and with his acknowledgment that he had seen plaintiff on only one occasion. Thus, the ALJ gave Dr. Araim's opinion little weight. (Tr. 15-17)

With regard to plaintiff's testimony, the ALJ found her activities of vacuuming, dusting, cleaning, cooking, and caring for her cat to be inconsistent with an inability to perform work. Further, the ALJ noted plaintiff's failure to seek regular psychiatric treatment. Plaintiff did not allege a disabling mental impairment on her application, and Dr. Baram found that her depressed condition was stable on medication. Thus, the ALJ determined that plaintiff did not have a severe or disabling psychiatric impairment. (Tr. 17-18)

With regard to plaintiff's knee strain and neurofibromatosis, the ALJ noted that plaintiff did not take strong pain medication and that she did not seek regular treatment for her conditions. In

addition, the ALJ pointed out plaintiff's history of relatively low income. He noted, however, that plaintiff did not present evidence of being refused treatment due to insufficient funds. The ALJ further found that plaintiff's depression and knee discomfort could be controlled with medication and/or exercises and were therefore not disabling. The ALJ noted that there was no medical evidence in the record which would indicate disability. Further, the ALJ found that plaintiff reported looking for jobs. In addition, plaintiff was able to work for several months with her symptoms after her alleged onset date. While plaintiff could not perform her past relevant work, the ALJ relied on the Medical-Vocational guidelines to determine that plaintiff could perform the full range of sedentary work. Thus, the ALJ concluded that plaintiff was not under a disability as defined by the Social Security Act. (Tr. 18-19)

## **Legal Standards**

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that plaintiff is not engaged in substantial gainful activity; (2) that she has a severe impairment or combination of impairments which significantly limits her physical or mental ability to do basic work activities; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her

9

impairments prevent her from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F. 3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record de novo. Id. at 1328 (citing Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-586 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that he

or she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[3] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak 49 F.3d at 1354.

## Discussion

Plaintiff argues that the ALJ improperly determined her credibility, erred in not finding that she suffered from a severe mental impairment, and failed to include limitations on crouching, stooping, etc., in his RFC assessment. Defendant, on the other hand, contends that the ALJ properly determined plaintiff's credibility, properly determined that plaintiff's mental impairment was not severe, and properly found that plaintiff could perform sedentary work. The undersigned finds that substantial evidence supports the ALJ's credibility findings, mental impairment findings, and RFC assessment.

First, the ALJ correctly assessed plaintiff's credibility and determined that her allegations of disabling conditions precluding work were inconsistent with the evidence and were not credible.

---

[3]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

Specifically, the ALJ pointed out plaintiff's testimony that she was able to help around the house, vacuum, dust, clean the kitchen, cook meals, and take care of her cat. Plaintiff reported to Dr. Araim that she kept busy by working on her computer. These activities are inconsistent with her allegations of disabling pain. Gwanthey v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) (holding that the plaintiff's ability to perform housework among other activities precluded a finding of disability). While these activities alone may not constitute substantial evidence that plaintiff is not disabled, the activities in conjunction with the lack of supporting medical evidence may be used to discredit plaintiff's subjective complaints. Kelley v. Callahan, 133 F.3d 583, 588-89 (8th Cir. 1998). In addition, plaintiff reported consistently looking for a job, which is inconsistent with her allegations of disability. "[T]his record of contemplating work indicates [Plaintiff] did not view h[er] pain as disabling." Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995).

The ALJ also noted that lack of supporting medical evidence, including plaintiff's failure to seek medical treatment for her knee pain, her failure to take strong pain medication, and her failure to continue exercises for such. Failure to seek medical treatment or take strong pain medication are inconsistent with allegations of disabling pain. Johnson v. Chater, 108 F.3d 942, 947 (8th Cir. 1997). In addition, no physicians restricted plaintiff's activities or made a finding of disability. The ALJ noted Dr. Araim's opinion that plaintiff had marked limitations in her ability to handle work stress. However, the ALJ also noted that this was inconsistent with Dr. Araim's own treatment notes indicating that plaintiff was doing fine. The record shows that Dr. Araim opined that plaintiff did not have a substantial loss of ability to understand, remember, and carry out simple instructions; make simple work-related decisions; and respond appropriately to supervision, co-workers, and usual work situations. (Tr. 440) In addition, Dr. Araim indicated that he saw plaintiff on only one occasion. (Tr.

441) The opinion of a physician who examines a plaintiff on only one occasion does not generally constitute substantial evidence Anderson v. Barnhart, 344 F.3d 809, 812 (8th Cir. 2003); Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000).

In addition, the record demonstrates that plaintiff's other psychiatrists indicated that she responded well to medication and that her condition was stable. The ALJ therefore properly refused to give Dr. Araim's opinion controlling weight. See Randolph v. Barnhart, 386 F.3d 835, 839 (8th Cir. 2004) (substantial evidence supported ALJ's refusal to give doctor's opinion controlling weight where the objective medical evidence did not support the opinion that plaintiff was unable to work). In sum, the ALJ properly discredited plaintiff's allegations that she was unable to perform any work-related activities by relying on inconsistencies in the record.

The plaintiff also argues that the ALJ erred in failing to find that she suffered from a severe mental impairment. As noted above, Dr. Araim, who examined plaintiff only once, was the only psychiatrist that indicated that plaintiff was unable to handle work stress. Additionally, this conclusion was inconsistent with his treatment notes and with the other medical evidence. Thus, the ALJ was not required to give weight to Dr. Araim's opinion that plaintiff suffered from a severe mental impairment.

Plaintiff also argues that the ALJ procedurally erred by failing to comply with the special technique for evaluating mental impairments according to the regulations, 20 C.F.R. §§ 404.1520a and 416.920a, pertaining to evaluating mental impairments. Because the ALJ failed to follow this technique, plaintiff asserts that the decision is not based on substantial evidence. The undersigned disagrees with this assessment. As stated above, the medical evidence does not support plaintiff's allegations of a disabling mental impairment. Further, treatment notes indicate that plaintiff's

depression was a single episode and in remission. While the ALJ should have discussed the factors set forth in 20 C.F.R. §§ 404.1520a and 416.920a, such error is harmless where the "evidence is strong enough to support the outcome despite the lapse." Lubinski v. Sullivan, 952 F.2d 214, 216 (8th Cir. 1991). Thus, substantial evidence supports the ALJ's determination that plaintiff's mental impairment was not severe.

Finally, the plaintiff argues that the ALJ erroneously failed to include the limitations of crouching and stooping in his RFC assessment. Plaintiff claims that Dr. Leung's observation that plaintiff could only squat two-thirds of the way down eroded the unskilled occupational base of sedentary work. Plaintiff also asserts that the ALJ should have utilized a vocational expert to determine what effect her postural limitation had on her ability to perform the full range of sedentary work. Defendant responds that plaintiff's postural limitations resulting from her leg amputation would not erode the occupational base for the full range of unskilled sedentary work because sedentary work does not usually require those activities.

The undersigned finds that substantial evidence supports the ALJ's determination that plaintiff could perform the full range of sedentary work. First, plaintiff cites Social Security Ruling (SSR) 96-9p, pertaining to stooping. Dr. Leung did not note any restrictions regarding stooping, only squatting. Thus, Plaintiff's reliance on that ruling is misplaced. Under SSR 85-15, stooping is "bending the body downward and forward by bending the spine at the waist." While plaintiff equates stooping to crouching/squatting, these are separate limitations. According to SSR 96-9p, "[p]ostural limitations or restrictions related to such activities as climbing ladders, ropes, or scaffolds, balancing, kneeling, crouching, or crawling would not usually erode the occupational base for a full range of unskilled sedentary work significantly because those activities are not usually required in sedentary

14

work." Thus, the ALJ properly found that plaintiff's ability to perform the full range of sedentary work was not diminished by any nonexertional postural limitations. Thus, the ALJ's decision finding the plaintiff not disabled will be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

_____
UNITED STATES DISTRICT JUDGE

Dated this 19th day of September, 2005.